(No. 30203.—

ILLINOIS CENTRAL RAILROAD COMPANY, Appellant, *vs.*
ILLINOIS COMMERCE COMMISSION, Appellee.

*Opinion filed September 18, 1947.*

JOSEPH H. WRIGHT, of Chicago, (VERNON W. FOSTER, and CHARLES A. HELSELL, both of Chicago, and PARKER, BAUER & PARKER, of Effingham, of counsel,) for appellant.

GEORGE F. BARRETT, Attorney General, of Springfield, (WILLIAM C. WINES, RAYMOND S. SARNOW, and JAMES C. MURRAY, all of Chicago, of counsel,) for appellee.

Mr. JUSTICE SIMPSON delivered the opinion of the court:

This is an appeal from a judgment of the circuit court of Effingham County, affirming an order of the Illinois Commerce Commission, directing the Illinois Central Railroad Company to restore passenger train service between Effingham, Illinois, and the Illinois-Indiana State line.

Prior to March 1, 1945, the Illinois Central Railroad Company operated passenger trains Nos. 333 and 334 as part of a service connecting Effingham, Illinois, with Indianapolis, Indiana. On that date the service of these two passenger trains was discontinued in response to General Order No. 47 issued by the Office of Defense Transporta-

tion, pursuant to the powers delegated to the President of the United States under the Second War Powers Act, 1942, as amended. General Order No. 47 was revoked on August 21, 1945. The railroad company did not restore the service of these two passenger trains, but continued to suspend their operation after the controls were removed by the Office of Defense Transportation. Thereafter, on October 17, 1945, the Illinois Commerce Commission issued a citation against the railroad company directing it to appear and show cause why the passenger service rendered by these two trains had not been restored. The railroad company appeared and offered evidence that the discontinuance of such service had been required by General Order No. 47 of the Office of Defense Transportation; that the trains had been operated at a great financial loss to the company; and that there was no public convenience and necessity for the continued operation of the two trains between the points in question. The commission found that service of the two passenger trains had been suspended, by order of the Office of Defense Transportation, from March 1, 1945, to August 21, 1945; that such service had not been restored after removal of controls by the Federal agency; that the company had not complied with the provisions of the Public Utilities Act regarding the abandonment and discontinuance of service by public utilities; and ordered that the service be restored. From a judgment of the circuit court, affirming this order, the railroad company perfected this appeal.

It is the contention of the railroad company that the service was lawfully discontinued by virtue of the order of the Federal agency, and that a showing that public convenience and necessity does not require the restoration of the service is a good defense to the order to show cause. It is the position of the commission that such service can only be abandoned and permanently discontinued upon approval of the commission, as provided by the Public

Utilities Act; and that the order of a Federal agency, temporarily discontinuing such service as a war measure, did not change the law in that respect.

Section 2(a)(2) of the act of June 28, 1940, as amended by paragraph 301, Title III of the Second War Powers Act, 56 Stat. 178, 50 U.S.C.A. (Supp. III) par. 633, 50 U.S.C.A. Appendix par. 633, provides in part: "Whenever the President is satisfied that the fulfillment of requirements for the defense of the United States will result in a shortage in the supply of any material or of any facilities for defense or for private account or for export, the President may allocate such material or facilities in such manner, upon such conditions and to such extent as he shall deem necessary or appropriate in the public interest and to promote the national defense." By section 2(a)(8) of the act the President is granted authority to exercise that power through such department, agency, or officer of the government as he may direct. That authority, so far as material here, was delegated to the Office of Defense Transportation, which promulgated General Order No. 47, effective January 11, 1945, for the duration of the war, unless sooner terminated, providing for the establishment of controls over passenger-train service. The purpose of the order, as recited therein, was to conserve fuel, manpower, railway and transportation facilities so that essential traffic might continue to move. Among the controls established was a restriction upon the operation of passenger trains, effective March 1, 1945, unless the occupancy of seats and space thereon during November, 1944, averaged 35 per cent or more. The railroad company notified the Office of Defense Transportation that the two passenger trains in question had an average occupancy of only 17.5 and 17.7 per cent, and accordingly discontinued service of these trains. The order was revoked on August 21, 1945, and the restrictions on operation of the passenger trains in question were removed. An exam-

ination of these war powers of the President, by virtue of which General Order No. 47 was issued, reveals that the Congress, as a war measure, set up a system of priorities over materials and facilities, together with certain standards under which the President should make them effective. Allocation of materials and facilities, under the Second War Powers Act, 1942, as amended, must be made upon conditions and to the extent that the President shall deem necessary or appropriate. The President is not authorized to exercise his power merely because he deems it necessary or appropriate in the public interest, but in addition it must also, in his opinion, be necessary or appropriate in the national defense. (*O'Neal* v. *United States*, 140 Fed. 2d 908, *certiorari* denied, 64 Sup. Ct. 945.) The power of the President to control the operation of passenger-train service was specifically limited to such measures as he found necessary or appropriate for the common defense of the country. This power was likewise limited to the duration of the war. The order under which trains Nos. 333 and 334 were discontinued was a temporary measure based upon and confined to the necessities of a nation at war.

Section 49a of the Public Utilities Act, (Ill. Rev. Stat. 1945, chap. 111⅔, par. 49a,) so far as is pertinent, provides as follows: "No public utility shall abandon or discontinue any service without first having secured the approval of the commission, * * *. In granting its approval, the commission may impose such terms, conditions or requirements as in its judgment are necessary to protect the public interest." Section 79 of the act (Ill. Rev. Stat. 1945, chap. 111⅔, par. 83,) makes it the duty of the commission to see that the provisions of the statutes of this State affecting public utilities are enforced and obeyed. The power of Congress, in the exercise of its general war powers, to control the facilities of the rail carriers for the common defense of the country is not questioned. General

Order No. 47 of the Office of Defense Transportation, issued in furtherance of such war powers, is conceded to be effective for the purpose for which it was issued, in derogation of the provisions of section 49a of the act regarding discontinuance of the services of the passenger trains in question. The further question then arises as to whether such order was effective to permit the railroad company to permanently abandon operation of such service without recourse to the provisions of this section of the act. This court in the case of *City of Geneseo* v. *Illinois Northern Utilities Co.* 378 Ill. 506, at page 525, had occasion to define the terms "abandon" and "discontinue" as used in section 49a of the Public Utilities Act. "Abandon means to relinquish or give up with intent of never again reserving or claiming one's rights or interest. [Citations] It is a voluntary act. [Citations] An involuntary act is not an abandonment. [Citation] Discontinue[ance] may be a voluntary act, but it may be brought about against the will of a person. Discontinue means to cease using, to interrupt continuance of." Applying these definitions to the facts of the present case it is apparent that a discontinuance and not an abandonment of the service took place as a result of the order of the Federal agency. It was an involuntary act, even though it may have been highly acceptable to the railroad company. In the light of the above definitions, what the railroad company now proposes is an entire abandonment of the particular passenger-train service it was rendering before the war-time controls were imposed. Its present position must be predicated on the proposition that such service was not only discontinued but was in fact abandoned by order of the Office of Defense Transportation. This position cannot be maintained. The Second War Powers Act, 1942, as amended, did not purport to delegate to the President power to order a rail carrier to abandon its passenger-train service, nor did any order issued pursuant to the powers

granted by said act pretend to order the abandonment of any such service. As heretofore pointed out, General Order No. 47 was of limited duration, issued solely as a war-defense measure, and amounted only to an order for temporary discontinuance of the two trains. At the time the citation was issued by the commission General Order No. 47 had ceased to be effective, the reason for such order no longer existed, and further discontinuance was not authorized by the Federal agency. Under these circumstances, it was the duty of the commission to take steps to enforce the statute and require the railroad company to show cause why its service was being discontinued. *State Public Utilities Com. ex rel. Beck* v. *Toledo, St. Louis and Western Railroad Co.* 267 Ill. 93.

The railroad company next complains that the commission did not consider evidence offered by the company that there was no public convenience and necessity for the continued operation of the two passenger trains, and did not consider evidence that such trains would be operated at an estimated loss of $75,000 a year. The citation filed by the commission contained statements that the railroad company had previously operated the two trains between terminal points in Illinois; that said operation had been suspended by General Order No. 47 of the Office of Defense Transportation, a Federal agency; that the order of the Federal agency had ceased to be effective because of the end of hostilities in the war; that the commission was informed that the operation of said trains had not been restored by the railroad company; and that said trains were then being discontinued without authority of the commission as required by law. The thing complained of was the discontinuance of the train service without approval of the commission. Matters relating to public convenience and necessity were not included among the things about which complaint was made. The railroad company was not put to its defense on that question. The issue pre-

sented was why the company was discontinuing its service without complying with section 49a of the Public Utilities Act. Section 64 of the act (Ill. Rev. Stat. 1945, chap. 111⅔, par. 68,) requires that carriers shall be notified of the complaint which they are required to answer, and, though no particular form is prescribed, there must be a statement of the thing which is claimed to be wrong, sufficiently plain to put the carrier upon its defense. The evidence should be limited to the issue made. (*Alton and Southern Railroad* v. *Commerce Com. ex rel. Perry Coal Co.* 316 Ill. 625.) The commission properly excluded from its consideration evidence offered on the question of public convenience and necessity, and matters relating to the cost of operating the trains.

There is a further reason why it is required that a public utility secure the approval of the commission before discontinuing or abandoning its service. One of the provisions of section 49a of the Public Utilities Act is that in granting its approval the commission may impose such terms, conditions or requirements as in its judgment are necessary to protect the public interest. One of the reasons for the enactment of section 49a of the act is for the purpose of settling questions arising between the utility and the public by reason of the termination of service, and in determining the steps necessary to protect the public in the transfer of the service from the company ceasing operations to one that may be available to take over the service. This section creates an additional feature of utility management over which the Commerce Commission has supervision. For the Commerce Commission to perform this service it is, therefore, necessary that application be made to the commission, as provided in this section, by the utility seeking voluntarily to abandon service. (*City of Geneseo* v. *Illinois Northern Utilities Co.* 378 Ill. 506.) The Illinois Central Railroad Company may not voluntarily abandon the service of passenger trains Nos. 333 and 334

without initiating proceedings for that purpose, and securing the approval of the Commerce Commission as provided in section 49a of the Public Utilities Act.

For the above reasons, the judgment of the circuit court of Effingham County, confirming the order of the Commerce Commission, is affirmed.

*Judgment affirmed.*